UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Tasheena V. Stewart,
        Plaintiff

        v.                                    Case No. 16-cv-341-SM
                                              Opinion No. 2018 DNH 064
Dartmouth Hitchcock Mary Hitchcock
Memorial Hospital,
        Defendant

**O R D E R**

Tasheena Stewart brings this action against her former

employer, Dartmouth-Hitchcock Medical Center (Mary Hitchcock

Memorial Hospital) ("DHMC"), claiming she was subjected to

unlawful workplace sexual and racial discrimination, in

violation of federal law.[1]  DHMC now moves for summary judgment

on each of Stewart's federal discrimination claims.  Stewart

objects.


For the reasons discussed, DHMC's motion for summary

judgment is granted.

---

[1]    Stewart's Amended Complaint (documents no. 1 and 10) also
asserted a state common law claim for wrongful termination.
But, by order dated May 31, 2017, the court granted DHMC's
motion to dismiss that claim as barred by the relevant statute
of limitations.

## Standard of Review

When ruling on a motion for summary judgment, the court is "obliged to review the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor." Block Island Fishing, Inc. v. Rogers, 844 F.3d 358, 360 (1st Cir. 2016) (citation omitted). Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In this context, a factual dispute "is 'genuine' if the evidence of record permits a rational factfinder to resolve it in favor of either party, and 'material' if its existence or nonexistence has the potential to change the outcome of the suit." Rando v. Leonard, 826 F.3d 553, 556 (1st Cir. 2016) (citation omitted). Consequently, "[a]s to issues on which the party opposing summary judgment would bear the burden of proof at trial, that party may not simply rely on the absence of evidence but, rather, must point to definite and competent evidence showing the existence of a genuine issue of material fact." Perez v. Lorraine Enters., 769 F.3d 23, 29–30 (1st Cir. 2014). In other words, "a laundry list of possibilities and hypotheticals" and "[s]peculation about mere possibilities, without more, is not enough to stave off summary judgment." Tobin v. Fed. Express

Corp., 775 F.3d 448, 451–52 (1st Cir. 2014). See generally
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).


## Background

At the outset, it is probably worth noting that Stewart has
decided to represent herself in this action. Recognizing that
the Federal Rules of Civil Procedure can be complex and - at
least for those not trained in the law - difficult to
understand, the court provided Stewart with a "Notice Regarding
Summary Judgment" (document no. 20). That notice included
copies of Rule 56, as well as the court's local rule governing
summary judgment. The court highlighted for Stewart her
obligation to respond to DHMC's motion for summary judgment with
competent evidence, in the form of admissible affidavits,
deposition testimony, and documents. Stewart was also reminded
of her obligation to set forth "a short and concise statement of
material facts, supported by record citations," as to which she
contends there is a genuine dispute so as to require a trial.
Local Rule 56.1 (emphasis supplied). Stewart has, for the most
part, failed to comply with those requirements.


While she has submitted a "Performance Evaluation Report"
dated August 31, 2011 (document no. 21-2), and a few emails she
says support her position, the majority of "facts" upon which

Stewart relies are unsupported by competent, admissible
evidence.  She has not, for example, submitted any affidavits.
Nor has she referenced any of the deposition testimony or
hearing testimony submitted by DHMC.  Instead, her narrative of
the relevant background is characterized by her feelings, her
beliefs, and her subjective interpretations of various events
she describes.  See, e.g., Plaintiff's Memorandum (document no.
21) at 2 ("Plaintiff Tasheena V. Stewart started working for
[DHMC] in June of 2011, and was treated unfairly,
disrespectfully, and made to feel uncomfortable on almost a
daily basis."); id. at 4 ("Andrea Rhodes enjoyed making
Plaintiff Tasheena V. Stewart uncomfortable."); id. at 5
("Andrea Rhodes' corrective actions were not true accounts of
the events that took place."); id. at 8 ("[U]ntruths were
gathered to unjustly terminate Plaintiff Tasheena V. Stewart.");
id. at 9 ("It is my belief that because I, Plaintiff Tasheena V.
Stewart, am a Black woman whom was mistreated and discriminated
[against], and spoke up about it, was wrongfully terminated on a
first warning and fake correctives from a racist and
disrespectful supervisor.").  See also Plaintiff's Sur-Reply
(document no. 25) at 2 ("When I found out from the EEOC that the
hospital hired the Black woman, I was not surprised.  If you are
accused of being racist and fostering a racist environment it
would make sense because you can now say look we hired a Black

woman."); id. ("This seems to be the climate of our nation at this time, where you see major institutions hiding, covering up, or protecting management, supervisors, and/or people in leadership roles that are outright mistreating employees and abusing their power.").

Putting aside, for the moment, Stewart's subjective beliefs and interpretations, the facts pertinent to summary judgment (as supported by competent evidence of record) are as follows. In 2011, Andrea Rhodes was (and had been for approximately four years) the Supervisor of DHMC's Cytogenetics Laboratory, where she oversaw the work of several clinical lab scientists and lab aides. In May of that year, she interviewed and hired Stewart as clinical lab scientist. Stewart began working in the lab in June of 2011, and her initial performance was quite good (indeed, her skills as a lab scientist never seem to have been in question). In August, Rhodes gave Stewart a very favorable "Performance Evaluation – 90 Day Introductory Review" (document no. 19-2).

The following month, Rhodes had an "awareness conversation" (DHMC's lowest level of counseling/discipline) with Stewart after Stewart "responded negatively" to having her work reviewed by a colleague whom Stewart believed had less experience than

she.  See Affidavit of Andrea Rhodes (document no. 19-16) at
para. 14.  Nevertheless, on December 1, 2011, Rhodes again gave
Stewart a very positive performance review (document no. 19-3).

Shortly thereafter, however, Rhodes reports that Stewart's
attitude deteriorated and her interactions with colleagues and
superiors became more volatile, hostile, and insubordinate.
Stewart was, for example, openly rude to Rhodes at a staff
meeting, she often complained about her co-workers, she was not
bashful about telling Rhodes (her supervisor) that Rhodes was
not doing her job properly, and she acted inappropriately toward
one of the lab aides who required minor accommodations due to a
medical issue.  The latter prompted another "awareness
conversation" with Rhodes in April of 2012.  Rhodes Affidavit at
para. 18.  A few months later, Stewart had "a loud, angry
outburst at a staff meeting," id. at para. 20, which prompted
Rhodes to contact Human Resources seeking assistance with
shaping Stewart's style of communication.  On September 25,
2012, Rhodes, Stewart, and Stephen Woods (Senior Employee
Relations Advisor) met and discussed Stewart's "unprofessional
manner of communication" and what she might do to correct it.
According to Rhodes, Stewart "repeatedly interrupted us and
would not allow us to finish speaking, which demonstrated the
very conduct we were coaching her about."  Rhodes Affidavit at

para. 23.  See also Affidavit of Stephen Woods (document no. 19-17) at para. 5 ("Ms. Rhodes explained that we were meeting to discuss Ms. Stewart's communication manner and style at work. Ms. Stewart immediately interrupted Ms. Rhodes.  When I tried to answer Ms. Stewart's questions, she also kept interrupting me. I finally told her that she needed to give us a minute to explain what the documented coaching was about.  Ms. Stewart's behavior during the coaching meeting was consistent with the problems Ms. Rhodes had described.").

The following day, Stewart, Rhodes, and Woods met again. According to Woods, "when Ms. Rhodes tried to explain the reasons for the coaching, Ms. Stewart angrily pointed her finger in Ms. Rhodes' face and called her a liar.  I told Ms. Stewart her behavior during the meeting was not acceptable."  Woods Affidavit at para. 6.  See also Rhodes Affidavit at para. 25. Stewart was then presented with a "written coaching," which had been prepared by Rhodes and reviewed by Woods.  It provided the following:

> In [our] conversation, we talked about how the manner
> (tone, volume, body language, persistence/interrupting)
> in which you communicate sometimes distracts from the
> message you are trying to deliver and can be disruptive
> and unprofessional.  Though you may not intend it, you
> often communicate with myself and others in a manner
> that is perceived as loud, angry, and disruptive.  Your
> manner of communication has disrupted team meetings and

> has been perceived by your co-workers as unprofessional. Unfortunately, in addition to being unprofessional, your manner of communication often does not have the desired effect of convincing others of your point of view. I know that you strive to act in a professional, collaborative, and respectful manner. I expressed to you my respect for your technical skills. However, this unprofessional manner of communicating is not acceptable, is contrary to D-H policy, and must stop. I am committed to helping you achieve that goal.

Documentation of Coaching Session (document no. 19-4). Despite the measured tone of that document, Stewart's response to it was plainly not professional (and certainly tone-deaf). In the "Employee Comments" section, Stewart wrote:

> I will not sign this document because what Rhodes is saying are lies! I intend on taking this matter as far as it needs to go until the truth comes out. [Andrea] Rho[d]es is a compulsive liar and extremely manipulative. I intend to have her and her behavior exposed in the coming days. I will not have my character marred by someone who is not truthful and cannot be trusted.

Id. Stewart's response illustrated the very workplace behavior with which Rhodes and Woods were concerned. But, notwithstanding the disrespectful and insubordinate comments Stewart had directed at her, Rhodes chose not to pursue the matter any further. Rhodes Affidavit at para. 27.

After a brief interlude of calm, Stewart resumed her disrespectful, coarse, and/or inappropriate behavior. In

November, Rhodes had another "awareness conversation" with Stewart about a disrespectful email she sent to Rhodes (see document no. 19-5). In early February of the following year, Rhodes had yet another "awareness conversation" with Stewart after Stewart refused to take a mandatory competency assessment that Rhodes had asked her to complete. Stewart acquiesced only after being informed that she would be subject to disciplinary action if she remained steadfast in her obstinance. Two weeks later, Rhodes was made aware of at least two occasions on which Stewart had adopted an "unprofessional tone and manner" toward a subordinate. One of those interactions had been witnessed by two other lab technologists, who confirmed to Rhodes that Stewart's behavior toward the co-worker was inappropriate. According to Rhodes, because she was already aware of other occasions on which Stewart had acted inappropriately toward that individual, and because she "felt that Ms. Stewart was creating a hostile work environment by bullying a subordinate," Rhodes Affidavit at para. 36, she decided she needed to discuss the situation with Stewart. But, in light of the "poor interactions in the past with Ms. Stewart when discussing her communication issues and recognizing this as a potentially volatile conversation," Rhodes asked Dr. Mohandas (Clinical Director of the Cytogenetics Lab) to be part of the conversation. Although Rhodes originally planned to give Stewart a "written warning"

for her conduct, she ultimately decided to downgrade the discipline and give her a "written coaching." Id. at para. 38. That written coaching provided:

> I would like to document the conversation we had on 2/20/2013 with Dr. T. K. Mohandas about your communication style, specifically when talking to [a Lab Aide].  In that conversation we heard your version of the events that [the Lab Aide] had reported.  We talked about how certain things that [the Lab Aide] does aggravates/frustrates the situation.  We also talked about how communications can be misinterpreted, even with the best of intentions.  We agreed that the workplace should be free from communications that could be interpreted as demeaning or disrespectful.
>
> To address this issue, you agreed to do the following: Add work related tasks to [the Lab Aide's] clipboard. Minimize conversation with [the Lab Aide] for a few weeks.  If there are items or situations that you would like addressed, you will relay them to Andrea Rhodes and in Andrea's absence, to Dr. Mohandas.  We will meet again in mid-March to reassess the situation.
>
> If your performance in this area does not improve within the stated period, I will have to initiate formal corrective action.  As I said in our meeting, you are welcome to any and all resources available to you through this or any other department.  However, I'm counting on you to take responsibility for the improvement as we discussed, and I know that you can.

Documentation of a Coaching Session (document no. 19-8).

According to Rhodes, when she presented that document to Stewart, "she handled the conversation well and did not have an explosive diatribe, as had happened in the past.  I wanted to encourage this communication style and complimented her on it."

Rhodes Affidavit at para. 40.  Stewart did, however, refuse to
sign the document.

Rhodes's patience in dealing with Stewart's workplace
insubordination and hostility was not unbounded, however.  It
seems it eventually ran out.  On June 25, 2013, Rhodes says a
"case-related task" had not been properly completed when the
case files were presented to her.  In her affidavit, she
recounts the relevant events as follows:

> Because Ms. Stewart was the assigned CLS, I brought
> the folders back to her at her desk in the Analysis
> Room and asked that she please complete them.  The
> tasks that I was asking her to do are activities that
> are expected of her position as a CLS III, she was
> trained to perform them, and she had previously
> performed them.  Ms. Stewart told me that she would
> not do so because it was not her responsibility, but
> rather it was the responsibility of the Lab Aide (who
> had left for the day).  Lab Aides often would assist
> technologists with these tasks, but responsibility for
> completion belonged to the CLS assigned to the
> rotation.  They are not difficult to do but sometimes
> staff forget to complete them.  I assured Ms. Stewart
> that it was her responsibility and asked her again to
> complete the tasks.  She refused.  I said, "Are you
> really doing this?"  I was astonished that Ms. Stewart
> was being insubordinate over a really minor request.

Rhodes Affidavit at para. 41.  Rhodes then asked Stewart to
accompany her to Dr. Mohandas' office, so they might discuss the
issue further.  Stewart continued to argue her point with Rhodes
in a loud and unprofessional tone.  She refused to complete the

work Rhodes requested of her, insulted Rhodes, and said
something to the effect that she hates working with Rhodes and
that Rhodes is a "terrible person." Id. at para. 44. That
prompted Rhodes to issue a "written warning" for
"insubordination and disruptive and unprofessional
communications" (document no. 19-9). Eventually, at Dr.
Mohandas' urging, Stewart acquiesced and agreed to perform the
requested tasks and she sent Dr. Mohandas an email upon their
completion.

Stewart's (unsworn) version of those events is slightly
different. She says she "was written up for not completing a
task that was completed and confirmed within eight minutes."
Plaintiff's Memorandum at 8. She goes on to assert that because
the task was completed, she "should not have been written up to
begin with. Then, [she] was terminated for the reaction
expressed in a meeting that should not have even occurred." Id.
In support of that view, she has submitted a copy of the e-mail
she sent to Dr. Mohandas, notifying him that she had completed
the requested tasks. See E-mail dated June 25, 2015 (document
no. 21-10) ("Dr. Mohandas, I filled out these forms. I
apologize that your time was wasted with ongoing nonsense.").
But, of course, that Stewart eventually (and begrudgingly)
agreed to comply with the clear directive of her supervisor and

do her job is beside the point.  The reason Dr. Mohandas was
brought into the situation in the first place was because
Stewart refused to comply with her supervisor's directive.

The following day, Stewart met with Rhodes and Woods (the
Senior Employee Relations Advisor) to discuss the events of the
prior evening.  Rhodes recounted the salient points of that
meeting as follows: "[Ms. Stewart] was not receptive to the
feedback I was trying to give her and became verbally aggressive
with me and Mr. Woods.  She called me a liar and said I was
psychotic.  At one point, she threatened me by saying that I was
going to 'get what I deserved' and she was going to 'take me
down.'"  Rhodes Affidavit at para. 47.  Mr. Woods' account of
the interaction is substantially similar:

> On June 26, 2013, I met with Ms. Rhodes and Ms.
> Stewart to discuss the warning.  During the meeting,
> Ms. Stewart threatened Ms. Rhodes, stating that she
> would "take her down."  She also said that Ms. Rhodes
> was psychotic.  As before, she repeatedly interrupted
> us during the meeting.  At one point, she told me to
> "write that down in your little book" and made other
> belittling comments about my note-taking.  Ms. Stewart
> also said that I was unprofessional and needed more
> training.  I told her that her behavior during the
> meeting was unprofessional and could subject her to
> further disciplinary action, including termination.  I
> had never witnessed an employee behave in such an
> unprofessional manner in such a meeting.

Woods Affidavit at para. 10.  See also Stewart Deposition at 163 ("Q: It says, 'She called Andrea a liar and said she was psychotic.' Did you say that? A: I did.").

That outburst, it would seem, was the proverbial last straw. On June 27, 2013, Rhodes and Woods met with Dr. Jonathan Park (Clinical Pathology Manager) and Michael Harhen (Administrative Director of the Pathology Department) to discuss whether Stewart's behavior warranted a "final warning" or termination. Woods told the group that Stewart's behavior was "the most unprofessional [he] had ever seen." Woods Affidavit at para. 11. After discussing the matter, all four participants in the meeting unanimously decided that Stewart's behavior had "crossed the line" and all agreed that her employment with DHMC should be terminated. Woods Affidavit at para. 11. See also Rhodes Affidavit at para. 49. Rhodes then prepared a "Corrective Action Form" (document no. 19-10) outlining the reasons for Stewart's termination.

On June 29, 2013, Rhodes and Woods met with Stewart to inform her that her employment was being terminated. Stewart was given a copy of the "Corrective Action Form," as well as her "Final Performance Appraisal" (document no. 19-11), which states that "Tasheena has excellent technical skills, unparalleled

initiative and true dedication to providing quality care for patients. While at D-H, Tasheena has gained technical experience in solid tissue culture and analysis of hematologic malignancies. Her interpersonal skills and communication skills do not meet D-H standards."

Stewart subsequently grieved her discharge, seeking removal of two corrective actions from her employee record and reinstatement to her position as a clinical lab scientist. During that process, she never asserted that any action was taken against her because of her race or gender. Woods Affidavit at para. 14. Instead, she claimed she lost her job because she was a "whistleblower" – that is, in retaliation for a complaint she made about a lab aid whom Stewart believed was not following proper procedures. Rhodes Affidavit at para. 59. The grievance panel upheld Stewart's discharge. See Step Three – Grievance Hearing (document no. 19-12). Stewart then filed a complaint with the New Hampshire Commission for Human Rights, alleging that she was the victim of both gender-based and racial discrimination.

In support of her claims of unlawful discrimination, Stewart recounted several examples of what she viewed as gender-based and/or race-based discriminatory animus on the part of

Rhodes.  First, she says that when purchasing new office chairs for employees in the lab, Rhodes ordered Stewart a chair designed for "an extremely overweight" person - something that Stewart says caused her to be embarrassed and subjected her to ridicule from co-workers.  According to Stewart, she weighs 200 pounds and was the "only plus-sized person working in the cytogenetics laboratory at the time."  Plaintiff's Memorandum at 4.  But, according to Rhodes' unrebutted testimony, her conduct was not motivated by discriminatory animus, nor was any offense intended.

> When a chair was ordered, employees, including Ms.
> Stewart, were merely asked to choose a chair color
> from a catalog of the Hospital's chair supplier, and
> also asked whether they wanted a chair with arms or no
> arms.  I did order a chair rated for 230 pounds and up
> for Ms. Stewart when she started because I did not
> want to ask her how much she weighed during her first
> week on the job. . . I apparently estimated
> incorrectly concerning her weight and promptly had a
> new chair ordered for her.  My actions were not
> intended to "intimidate, insult, disrespect [or]
> harass" or "humiliate" Ms. Stewart.

Second Rhodes Affidavit (document no. 23-2) at para. 5.


Next, Stewart says Rhodes referred to her as "city people." Stewart testified that, based on Rhodes' use of the phrase, she inferred that Rhodes "perceived [Stewart's] communication style to be loud and scary."  Transcript of N.H. Employment Security

Appeal Tribunal Hearing (October 23, 2013 (document no. 19-15) at 34.  See also Id. at 37.  It is, however, entirely unclear whether Stewart perceived the phrase "city people" as some sort of oblique racial slur.  For example, at her deposition, Stewart was asked how the "city people" comment related to the loss of her job.

> A.  I think she [Rhodes] felt -- she in her mind felt like I didn't fit in because I was a city person.
>
> Q.  And are you saying you didn't fit in because you were Black?
>
> A.  She said a city person.
>
> Q.  No.  I understand that.  But you equated --
>
> A.  I didn't say I equated it.  I said city people are loud.  City people behave in a certain way. There's a lot to it.  I feel like you're trying to go towards this [like] I'm making it a Black thing.  This woman was a headache in so many other things aside from me being Black that that's a small piece of it.

Stewart Deposition at 73.  For her part, Rhodes testified that:

> I understand Ms. Stewart now claims that I used the term "city people" as a euphemism for "black people." This is not true.  In fact, when I moved to the Upper Valley from Connecticut, my lab friends nicknamed me "city girl."  In trying to help Ms. Stewart with her colleagues, I did try to explain how I had come to learn that people in the Upper Valley communicated somewhat differently than "city people" like us, but the comment had nothing to do with Ms. Stewart's race or gender.

Rhodes Affidavit at paras. 58.

Indeed, having been in the same position herself, it would seem that Rhodes understood the difficulty "city people" might have in transitioning to life in the Upper Valley. And, to her credit, she seems to have made substantial efforts to assist Stewart in making that transition. When Stewart first arrived in the area, she was unable to locate housing and was living in a hotel. After she complained to Rhodes that the hotel had increased the cost of her room, Rhodes told Stewart that she and her husband had an empty bedroom in their home and offered to let Stewart stay with them until she found long-term housing. Additionally, when Stewart began working at DHMC, she did not have a car or driver's license. So, Rhodes would, on occasion, take her shopping - particularly on the weekends, when the local busses were not running. Rhodes also gave a bicycle to Stewart's boyfriend, to help him get around town. She also took Stewart to different towns to look at various apartments. And, once Stewart found an apartment, Rhodes gave her a sewing machine and fabric when she learned that Stewart wanted to make curtains for her living room. <u>See</u> Rhodes Affidavit at paras. 8-9. Of course, at least that early conduct toward Stewart (including the fact that Rhodes actually hired Stewart) suggests that Rhodes did not bear any racial or gender-based animus

toward Stewart.  See, e.g., Proud v. Stone, 945 F.2d 796, 797–98 (4th Cir. 1991) ("[I]n cases where the hirer and the firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer.").

Finally, in relation to her claims of gender-based discrimination, Stewart says Rhodes engaged in unwelcome talk about sexual topics, attempted to hug Stewart and/or rub her back when she knew (or should have known) that Stewart didn't like to be touched, and made an odd comment about horses she owned.  At her deposition, Stewart testified about that alleged incident as follows (since it is one of the few instances of alleged sexual harassment, it is important to note):

A.    Let me say this to you.  I considered most of the
      things she said to me inappropriate.  And felt
      like she harassed me.  I did not label it sexual.
      EEOC said those things are sexual harassment.

Q.    What things?

A.    Like she had horses.

Q.    Right.

A.    And one day she says to me, would I go with her
      to her house after work and help her jerk off her
      horses because they get backed up.

19

Stewart Deposition at 97-98.  Rhodes' response to that
allegation is concise, but direct: "I never spoke with Ms.
Stewart about sex, sex acts, or anything of the sort.  My horses
are/were geldings."  Second Rhodes Affidavit at para. 6.

After completing its investigation into each of Stewart's
allegations of racial and/or sexual discrimination (all of which
are discussed in detail in its report), the New Hampshire
Commission for Human Rights concluded that there was "no
probable cause" to credit any of them.  Report of New Hampshire
Commission on Human Rights (document no. 19-13) at 1-7.  The
United States Equal Employment Opportunity Commission adopted
the investigative findings of the New Hampshire Commission.  Id.
at 8.  This litigation ensued.

## Discussion

As construed by the magistrate judge, Stewart's amended pro
se complaint advances three federal claims: (1) workplace sexual
harassment in violation of Title VII of the Civil Rights Act;
(2) workplace racial harassment, also in violation of Title VII;
and (3) workplace racial harassment, in violation of 42 U.S.C. §
1981.  See Order on Preliminary Review (document no. 11).  None
of those claims has merit.

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.A. § 2000e-2.  Similarly, Section 1981 of Title 42 makes it unlawful for employers to discriminate on the basis of an employee's race.

When, as here, the plaintiff has not (or cannot) point to any overt evidence of gender-based or racial discrimination, courts typically employ the burden-shifting framework articulated by the Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  <u>See also</u> <u>Ayala-Gerena v. Bristol Myers-Squibb Co.</u>, 95 F.3d 86, 95 (1st Cir. 1996) (observing that the familiar burden-shifting framework articulated in <u>McDonnell Douglas</u> also applies to racial discrimination claims arising under § 1981).  The Court of Appeals for the First Circuit has summarized that analytical framework as follows:

> Under this formulation, a plaintiff opens with a prima facie showing of certain standardized elements suggestive of possible discrimination. . . .
>
> Establishment of the prescribed prima facie case creates a presumption that the employer engaged in impermissible age discrimination.  However, to rebut this presumption, the employer need only articulate a

legitimate nondiscriminatory reason for the employee's termination.  The employer's obligation is simply one of production.  The burden of persuasion remains the employee's at all times.

LeBlanc v. Great American Ins. Co., 6 F.3d 836, 842 (1st Cir.

1993) (citations and internal punctuation omitted).  And, the

Supreme Court has instructed that,

> [Provided] the defendant has succeeded in carrying its burden of production, the McDonnell Douglas framework - with its presumptions and burdens - is no longer relevant. . . .  The presumption having fulfilled its role of forcing the defendant to come forward with some response, simply drops out of the picture.

St. Mary's Honor Center v. Hicks, 509 U.S. 502, 510–11 (1993).

At that point, the burden reverts to the employee, who must

demonstrate that the reason articulated by the employer for the

adverse employment action was a mere pretext for unlawful racial

or gender-based discrimination.  See LeBlanc, 6 F.3d at 842.

And, as the court of appeals has instructed, the employee must

produce "not only minimally sufficient evidence of pretext, but

evidence that overall reasonably supports a finding of

discriminatory animus."  Id. at 843 (citation and internal

quotations omitted).


So, to avoid summary judgment in this case, Stewart must

come forward with some admissible evidence, either direct or

circumstantial, of DHMC's discriminatory animus. She "may not simply refute or question the employer's reasons" but, instead, she "must produce evidence that the real reason for the employer's actions was discrimination." Gadson v. Concord Hospital, 966 F.2d 32, 34 (1st Cir. 1992) (emphasis supplied).

Given the undisputed evidence of record, as set forth above, it is plain that Stewart has failed to meet her obligation to set forth a prima facie case of unlawful gender-based or racial discrimination. For example, she has not shown that she was "performing [her] job at a level that rules out the possibility that [she] was fired for job performance," nor has she shown that DHMC "sought a replacement for [her] with roughly equivalent qualifications." Benoit v. Tech. Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003). But, even if she had carried that modest initial burden, DHMC has responded with a patently legitimate, nondiscriminatory basis for Stewart's discharge: "During that meeting [on June 26, 2013], Tasheena behaved in an unprofessional, hostile, threatening, and aggressive manner, contrary to [DHMC's] Code of Ethical Conduct and Rules of Conduct." Notice of Termination ("Corrective Action Form") (document no. 19-10), at 1. See also Stewart Deposition at 163 (admitting that she called Rhodes, her supervisor, "psychotic" and a "liar"). See generally Pearson v. Massachusetts Bay

Transp. Auth., 723 F.3d 36, 41 (1st Cir. 2013) ("As we have
often found, insubordination is obviously sufficient to support
an adverse employment action.").

In response, Stewart has failed to identify any evidence
suggesting that the true reason for her discharge was unlawful
discrimination (either racial or gender-based).  Stated slightly
differently, there is no competent evidence in the record "from
which to conclude that the proffered reason for [Stewart's]
termination was not in fact the real reason."  Fontanez-Nunez v.
Janssen Ortho LLC, 447 F.3d 50, 56 (1st Cir. 2006).  Nor has
Stewart pointed to any evidence suggesting that she was
subjected to gender-based or racial harassment in the workplace
during the course of her employment - certainly not to the point
that it was so severe or so pervasive as to materially alter the
conditions of her employment and create an abusive work
environment.  See generally Maldonado-Catala v. Municipality of
Naranjito, 876 F.3d 1, 10 (1st Cir. 2017); Garmon v. Nat'l R.R.
Passenger Corp., 844 F.3d 307, 317 (1st Cir. 2016).  See also
Faragher v. City of Boca Raton, 524 U.S. 775, 787-88, 118 S. Ct.
2275, 2283, 141 L. Ed. 2d 662 (1998) ("[W]e explained that in
order to be actionable under the statute, a sexually
objectionable environment must be both objectively and
subjectively offensive, one that a reasonable person would find

hostile or abusive, and one that the victim in fact did perceive
to be so.  We directed courts to determine whether an
environment is sufficiently hostile or abusive by 'looking at
all the circumstances,' including the 'frequency of the
discriminatory conduct; its severity; whether it is physically
threatening or humiliating, or a mere offensive utterance; and
whether it unreasonably interferes with an employee's work
performance.'") (citations omitted); Stewart Affidavit at 108
("So, like I said, [Rhodes] was always overly friendly and
inappropriate, but she wasn't - it didn't get to a point where
it affected my work or affected my comfort level at the job.").

Here, as in Tobin, supra, "the plaintiff has not pointed to
a shred of competent evidence adequate to elevate her surmise
from the realm of the possible to the realm of the probable.
Speculation about mere possibilities, without more, is not
enough to stave off summary judgment."  775 F.3d at 452.  None
of Stewart's papers makes reference to an affidavit, deposition,
or hearing transcript in support of her factual allegations or
her assertion that she was treated unlawfully.  And, her
beliefs, feelings, impressions, and interpretations of various
alleged events are simply insufficient.

> It bears repeating that genuine issues of material
> fact are not the stuff of an opposing party's dreams,

and a party cannot successfully oppose a motion for
summary judgment by resting upon mere allegations or
denials of his pleading.  If a nonmovant bears the
ultimate burden of proof on a given issue, she must
present definite, competent evidence sufficient to
establish the elements of her claim in order to
survive a motion for summary judgment.  This is no
less true in discrimination and retaliation cases
where motive is at issue; a nonmovant cannot rely
merely upon conclusory allegations, improbable
inferences, and unsupported speculation.

Pina v. Children's Place, 740 F.3d 785, 795–96 (1st Cir. 2014)

(citations and internal punctuation omitted).  Moreover,

Stewart's pro se status does not absolve her of the obligation

to identify some (any) trial-worthy questions of material fact.

See, e.g., Eagle Eye Fishing Corp. v. United States Dep't of

Commerce, 20 F.3d 503, 506 (1st Cir. 1994) ("A pro se litigant,

like any litigant, is guaranteed a meaningful opportunity to be

heard.  While courts have historically loosened the reins for

pro se parties, the right of self-representation is not a

license not to comply with relevant rules of procedural and

substantive law.") (citations and internal punctuation omitted).


## Conclusion

Stewart's failure to support her discrimination/harassment

claims with adequate competent evidence compels the court to

conclude that there are no trial-worthy, genuinely disputed

issues of material fact.  See generally Perez v. Lorraine

Enters., 769 F.3d at 30. And, given the undisputed facts of record, it is plain that DHMC is entitled to judgment as a matter of law with respect to each of Stewart's federal employment-related discrimination claims.

Accordingly, for the foregoing reasons, as well as those set forth in DHMC's legal memoranda, DHMC's motion for summary judgment (document no. 19) is granted. The Clerk of Court shall enter judgment in accordance with this order and close the case.

        **SO ORDERED.**

                                    _____
                                    Steven J. McAuliffe
                                    United States District Judge

March 26, 2018

cc:  Tasheena V. Stewart, pro se
     William D. Pandolph, Esq.